C. F. BURK et al., *Appellants,* v. THE OTTAWA GAS AND ELECTRIC COMPANY et al., *Appellees.*

No. 17,310.

SYLLABUS BY THE COURT.

1. CORPORATION—*Preferred Stock—Contract—Dividends.* The capital stock of a corporation was issued and subscribed in the ratio of three-tenths preferred stock to seven-tenths common stock, and the by-laws, adopted at the organization, provide: "The preferred stock shall carry a six per cent per annum preferred, noncumulative dividend, payable semi-annually on the first days of July and January of each year after January 1st, 1906, out of the net profits of the preceding fiscal year, and a *pro tanto* dividend if such dividend fall short of 6 per cent; and the preferred stock may be called in as a whole or in *pro rata* installments at 101 and accrued dividend

.and cancelled at the option of the board of directors on three months notice at any dividend paying period after two years dividend has been paid thereon." *Held*, (1) that such by-law constitutes a contract between the preferred stockholders and the corporation which a court of equity will enforce when the specified conditions exist which entitle the preferred stockholders to a dividend and it is refused them; (2) the cost of operating the plant in furnishing gas within the city, including necessary repairs, extensions, fixed charges, taxes and other necessary expenses, only, shall be charged as expenses to be deducted from the entire receipts from the business to determine the net profits.

2. ——— *Same.* If net profits, as above defined, had accrued in the business from year to year it was not within the discretion of the board of directors to declare or not to declare a dividend on such preferred stock. If the funds were available for the purpose, the preferred stockholders were entitled to a dividend as a matter of right. .

3. ——— *Same.* The duty to declare a dividend upon such preferred stock is, however, subordinate to the obligation of the corporation to the public. And if it was necessary to use all of the earnings in the enlargement of the plant in order to fulfill such obligation the declaration of a dividend was not required.

4. ——— *Gas Franchise—Extension of Service.* Although the contract of the corporation with the city requires it to extend its service upon the application of five patrons, a duty to make an extension may arise without the making of such application.

Appeal from Franklin district court. Opinion filed May 11, 1912. Reversed.

*W. S. Jenks,* and *F. M. Harris,* for the appellants.

*Ralph E. Page,* and *Harkless, Crysler & Histed,* for the appellees.

The opinion of the court was delivered by

SMITH, J.: This action was brought by the preferred stockholders of the Ottawa Gas and Electric Company against two other corporations, alleged to have some interest in the matter in controversy, and W. T. Harris, George A. Rodgers, C. H. Pattison, S. J.

Mattox, V. Hundley and I. W. King, alleged to be the officers and directors of the Ottawa Gas and Electric Company.

The action was brought to require all of the defendants to account for all the property and assets of every description which were at the time of bringing the action or had been at any time in the possession of the defendants or any of them, and that upon the final hearing of the action the court should order the directors of the Ottawa Gas and Electric Company to declare such dividends from the net profits of the business of such company as should have been declared since January 1, 1906, and further, to restrain the officers and directors of the Ottawa Gas and Electric Company during the pendency of the action from paying out any of the money or disposing of the assets of the company except such amounts as should be necessary to pay the actual necessary current expenses of conducting the business of the company, and other relief is prayed for.

Upon the filing of the petition a temporary injunction was allowed, but thereafter was discharged upon the defendants giving a bond, which was approved by the court, to satisfy any judgment which might be rendered in the action. The action is, of course, equitable.

A motion for a new trial was overruled and judgment rendered against the plaintiffs for costs, and they appeal.

The following copy of a certificate of stock is attached to the petition as a facsimile, except as to the name and number of shares, of the shares of stock issued to each preferred stockholder.

"NUMBER                                              SHARES.
   36                                                    8
          "THE OTTAWA GAS AND ELECTRIC CO.
                    Ottawa, Kansas.
                Capital Stock, $250,000.

"THIS CERTIFIES that C. F. Burk is the owner of eight shares, fully paid, of the preferred stock of The

Ottawa Gas and Electric Company, transferable only on the books of the company in person or by an attorney on surrender of this certificate properly endorsed.

"The capital stock of this company is subject to the following conditions and provisions of the by-laws:

" 'Article 4. Section 1. 'The $250,000 capital stock of this company shall be divided into two classes, of which $75,000 shall be preferred and $175,000 shall be common stock, both of which shall have equal voting power but to which the following different conditions shall otherwise respectively attach; viz: The preferred stock shall carry a six per cent per annum preferred, non-cumulative dividend, payable semiannually on the first days of July and January of each year after January 1st, 1906, out of the net profits of the preceding fiscal year, and a *pro tanto* dividend if such dividend fall short of 6 per cent; and the preferred stock may be called in as a whole or in *pro rata* installments at 101 and accrued dividend and cancelled at the option of the board of directors on three months notice at any dividend paying period after two years dividend has been paid thereon. Upon the common stock only such dividend and at such times shall be paid out of the company's net profits as the board of directors may in their judgment deem it advisable to declare.'

"IN WITNESS WHEREOF, The company has caused this certificate to be signed by its duly authorized officers and its corporate seal to be hereunto affixed this 12th day of October, A. D. 1906.

"CHAS. T. LUTHY,                  C. H. PATTISON,
        "Secretary,                           President.
                "Shares $100 each."

The following findings of fact are all that are considered necessary to present the issues:

"II.

"In September, 1905, the mayor and councilmen of the city of Ottawa, by ordinance duly enacted, granted to C. H. Pattison and his assigns a franchise to construct and maintain a natural gas plant in the city of Ottawa for the term of twenty-five years. The franchise among other provisions had the following:

" 'Section 13. The said C. H. Pattison, his successors and assigns shall extend the pipes and mains for conducting said natural gas and electric light wires, and service whenever five consumers of an shall request that such extension shall be made.'

"IV.

"On September 23, 1905, said C. H. Pattison, together with W. L. Pattison and the plaintiff Charles T. Luthy, G. A. Rodgers and W. T. Harris, organized a corporation known as The Ottawa Gas and Electric Company, and the defendant in this case, with a capital stock of $250,000.00 divided into 2500 shares of $100.00 each.

"V.

"Before organizing this corporation the said C. H. Pattison leased from the Ottawa Gas and Heating Co., its artificial gas plant for a term of twenty-five years for $1500.00 per year, which amount was just.sufficient to pay the interest upon the bonds of that company."

To which the court afterward added:

"Shortly after leasing said Ottawa Gas & Heating Co., the said C. H. Pattison became the owner by purchase of said plant."

"VI.

"On or about October 11th, 1905, at the first meeting of the stockholders of the new corporation, all the stockholders being present said C. H. Pattison proposed to the stockholders that he would transfer to the new corporation, which for brevity I will hereafter refer to as The Ottawa Gas Co. all of his right, title and interest in the Ottawa franchise and the gas contract with the Natural Gas Co. and the lease from the Ottawa Gas and Heating Co., and would at his own expense make certain repairs and furnish certain appliances to transform the artificial gas plant into a natural gas distributing plant, which expenditure was afterwards by agreement fixed definitely at $40,000.00 for the sum of $325,000.00, $250,000.00 to be applied in payment of subscriptions to the capital stock of the new corporation, as follows: $246,000.00 to C. H. Pattison, $1000.00 to W. L. Pattison, $1000.00 to Charles T. Luthy, $1000.00 to G. A. Rodgers, and $1000.00 to W. T. Harris the stock thus issued to be in the proportion of seventy per cent common stock and thirty per cent preferred stock, and for the remaining $75,000.00 the company should issue to him $75,000.00 of the bonds of the company, secured by first mortgage bearing six per cent, which proposition was by the company accepted, and in due time fully carried out.

"IX.

"About the time of the organization of these different corporations said C. H. Pattison organized what was known as The Union Gas and Traction Co. of New Mexico, which he controlled. The only assets of the corporation was the stocks and bonds of the various Kansas corporations organized by him, and its only business seemed to be to handle these stocks and bonds. About the same time he organized The Union Gas and Traction Company of Missouri, and the only business of this latter corporation was to enter into a contract with The Ottawa Gas Co., and the other corporations furnishing natural gas to the towns along the pipe line, for the operation of these various plants at a stipulated sum per meter; and this Missouri corporation is now engaged in this business. All these corporations are controlled by C. H. Pattison.

"X.

"The Ottawa Gas Co., commenced business in October, 1905, and in July, 1906, had on hand a surplus in cash of $2331.94. During that period it made no extensions to the Ottawa plant. From July, 1906, to July, 1907, the Ottawa Co. expended for extensions $5568.21, and had a surplus on hand at the end of that fiscal year of $732.49. From July, 1907, to July, 1908, it expended in extensions to the Ottawa plant $5499.14 and closed that fiscal year with a surplus of $2604.76. From July, 1908, to July, 1909, the company spent for extensions to the Ottawa plant $2416.58, and closed that fiscal year with a surplus of $1969.40."

To which the court afterward added the following:

"The above and foregoing items of surplus on hand at the end of each fiscal year, as above stated, in the aggregate amounted to $7638.59, which was the surplus on hand June 30, 1909. On July 13, 1909, the regular annual meeting of the stockholders was held at the office of The Banking Trust Co., Kansas City, Kansas, pursuant to due notice given. This was after the commencement of this action. There was represented at that meeting 2245 shares out of the 2500 shares of capital stock of this corporation. None of the plaintiffs in this action were present. At that meeting the president reported that there was on hand of undivided profits $7638.59. He further reported that there would

be due to the city of Ottawa during the month of July, 1909, $2500.00 and that there were past due coupons outstanding and unpaid sufficient to reduce the surplus to $4000.00, and that further extensions were necessary, so that in the judgment of the management the directors were not warranted in declaring a dividend. This report was unanimously adopted by the stockholders at this meeting. The treasurer further reported that the management had expended up to that date $13,483.93 for extensions, and recommended in his report that the directors be authorized to make such further extensions and additions as would be profitable to the company, upon which recommendations the following resolution was passed: 'Resolved that the acts of the directors in the payment of money for extensions and additions to the property at Ottawa be hereby approved, and that the directors be further authorized to expend such sums in further extensions as in the opinion of the Board of Directors will be profitable to the company.' From July 1909 to January 1910, the company expended for extensions to the Ottawa plant $3138.62, and closed that year with a deficit of $3696.43. This, however, did not include the receipts for January, 1910, which amount would be sufficient to liquidate the above deficit, and leave a substantial amount of money in the treasury. Taking into consideration the magnitude of the business, the expense of maintenance, and the obligations of the company there was at no time from the company's organization to the time of the commencement of this action a sufficient surplus in the treasury to warrant the directors in declaring a dividend."

The action of the meeting was as follows:

" 'On motion duly made, seconded and carried the report was received and approved and the secretary directed to incorporate it in the minutes of this meeting.' "

"XI.

"The evidence does not disclose any extravagance in the management of the company, nor any misappropriation of its funds.

"XII.

"If the money used by the company to pay for extensions to the Ottawa plant from July, 1906, to January, 1910, had not been so expended as above stated, the

amounts thus expended would have been available for the payment of dividends upon the stock of the company."

This finding was later amended as follows:

"At the meeting of the directors of The Ottawa Company held on July 13th, 1909, the president reported that adjacent to the city of Ottawa extensions had been made by other parties independent of The Ottawa Company and that such extensions should in the opinion of Mr. Pattison belong to The Ottawa Company, and that arrangement could be made whereby such consumers could be turned over to The Ottawa Company on the payment of $100 per meter, and that he believed that they would be a good investment and recommended that he as president be authorized to purchase such consumers. It was moved and carried that such authority be given to purchase such consumers for not to exceed $6500.00 and the president was further directed to spend such money in extensions and additions as in his judgment would be profitable. This meeting was attended by the defendants C. H. Pattison, S. J. Mattocks, V. Hundley, and by Mae Critchfield, a sister in law of C. H. Pattison, and W. L. Pattison his brother. This action was commenced on March 6th, 1909."

"XIII.

"The petition states with substantial accuracy the ownership of the stock at the time of the commencement of this suit.

"XIV.

"At the time of the commencement of this action, an application was made for the appointment of a receiver, upon consideration of which the court ordered that a receiver be not appointed if the defendants would enter into a bond to the plaintiffs to pay to the plaintiffs any dividend that should be found due them upon the final hearing of this cause, which bond was accordingly given, and a copy whereof is attached to these findings and made a part hereof."

The court made the following conclusions of law:

"I.

"From the foregoing facts I conclude that at no time since the commencement of business by the defendant company was its financial condition such as to warrant

the declaring or paying of any dividends upon either the common or preferred stock.

"II.

"There should be a judgment in favor of the defendants and against the plaintiffs for costs."

The plaintiffs maintain that the earnings of the business were such that the directors owed them an imperative duty to declare a dividend. The defendants maintain that the corporation had been unable to declare a dividend because its funds were exhausted by expenditures which it was obliged to make. The evidence is not preserved, and the case must be decided upon the findings. The principal expenditure, the propriety of which is brought in question, was for extensions of the company's plant. The court found that these extensions "were necessary and for the betterment of the plant and the accommodation of the patrons." If the word "necessary" is interpreted to mean that the extensions were such as the corporation was required to make by its obligation to the public, then, in the opinion of this court, the trial court was right in holding that the plaintiffs could not look for dividends to any part of the funds so expended. The finding is of course to be given an interpretation consistent with the decision rendered, rather than opposed to it. But other portions of the findings have some tendency to suggest that the trial court used the term "necessary" as meaning merely that the extensions were advisable as a matter of good management, for the benefit of the business. If it is so interpreted this court is of the opinion that the funds so employed were wrongfully diverted from the payment of dividends to the plaintiffs. In view of the fact that after the action was begun a stockholders' meeting voted to make such additional extensions as would "be profitable to the company," there seems to be sufficient doubt as to the theory upon which the trial court proceeded, so that justice will be best subserved by remanding the case with directions to take further testi-

mony, if necessary, make the findings definite, and render such judgment as the facts may require, according to the principles of law here declared. The findings as to the financial condition of the corporation at the end of each year are not so specific as might be desired, and counsel disagree as to their interpretation.

The conditions under which the holder of preferred stock may demand a dividend depend of course upon the precise terms upon which it is issued. The provision of the by-laws relating to dividends upon the stock here involved reads as follows:

"The preferred stock shall carry a six per cent per annum preferred, noncumulative dividend, payable semiannually on the first days of July and January of each year after January 1st, 1906, out of the net profits of the preceding fiscal year, and a *pro tanto* dividend if such dividend fall short of 6 per cent."

The fair interpretation of the contract between the corporation and the holder of this stock is that if in any year net profits are earned, a dividend is to be declared. To hold that the board of directors, that is to say, the corporation, has a discretion to declare or not to declare a dividend when it has funds that it can use for the purpose is to hold that one of the parties to a contract has the option to pay something to the other or not, at its own election, since, if the dividend is not declared at the end of the year, the benefits of the accumulated profits are practically lost to these stockholders. Such a construction should be avoided if any other is reasonably open, because it would result in temptation to unfair dealing. (See Note, 73 Am. St. Rep. 234; 1 Cook, Corporations, 6th ed., § 272, p. 755; 1 Morawetz on Private Corporations, 2d ed., § 459.)

It is against public policy to construe the terms upon which stock is issued so as to require dividends to be paid to preferred creditors out of the invested capital, as that might result in the destruction of the corporation. (*Lockhart v. Van Alstyne*, 31 Mich. 76, 18 Am. Rep. 156.) But no such objection attaches to a con-

struction that makes mandatory the payment of dividends out of the net profits.

In *New York, &c., Railroad v. Nickals*, 119 U. S. 296, the court decided that the question whether noncumulative dividends should be declared on preferred stock was one to be determined by the directors, but the decision was based explicitly upon the exact language there employed to define the rights of the holders, namely: "Preferred stock . . . entitling the holders to non-cumulative dividends . . . in preference to the payment of any dividends on the common stock . . . as declared by the board of directors." (p. 300.) This was held to mean that the dividends were dependent upon being declared by the directors.

The language already quoted, descriptive of the dividend-carrying qualities of the preferred stock under consideration, can hardly have been intended to give the directors discretion to declare or not to declare a preferred dividend, or it would not have contrasted so sharply with that employed in the case of the common stock, reading thus:

"Upon the common stock only such dividends and at such times shall be paid out of the company's net profits as the board of directors may in their judgment deem it advisable to declare."

The directors of the corporation owed a positive duty to pay a dividend to the preferred stockholders whenever in any year there were net profits available. The funds that might be used for that purpose could not rightfully be expended for extensions merely for the benefit of the business, nor could they be withheld to meet the expenses of the next year. Inasmuch as the only possible source of profit to the preferred stockholder from his investment is the distribution of earnings in the year in which they accrue, he has a right to insist that an accounting shall be taken annually, and that the surplus of one year, available for a dividend, shall not be carried over to meet a possible deficiency of the next.

The holder of the preferred stock, however, is not generally a creditor until a dividend is declared, but as equity regards as done that which ought to be done, if under the facts of this case a dividend or dividends ought to have been declared in a certain year or years to such stockholders, they should be regarded as creditors to such extent from such time or times, in this equitable action. The company's contract with the preferred stockholder is not to pay him at all events the amount of the net profits of each year up to six per cent, but to declare a dividend on that basis. The obligation to declare a dividend arises only when there is (or as to the stockholder ought to be) money available with which to pay it. Although the business of the year may show the earning of net profits, counting as gain what has gone into betterments, yet if the money taken in has been expended in performance of a duty superior to that owed to the stockholder, no obligation to declare a dividend can arise. The obligation of the corporation to pay dividends on the preferred stock out of the yearly net profits is subordinate to whatever obligation it owes to the public. Therefore if it was necessary for the corporation to use the surplus in any year to make extensions to which patrons were entitled, a dividend for that year would be excused. The corporation operated under a franchise requiring it to extend its service whenever requested by five consumers. It might, however, owe a duty to the public to make an extension without such a request having been made. If extensions were necessary in order to properly discharge the duty of the company under its franchise it had the right to make them without such request, although the requests might be a necessary step in proceedings to compel the company to make the extensions.

The action is one to control the conduct of the corporate business so as to insure fair treatment of the plaintiffs. Any relief that may be proper to that end should be awarded, although based upon matters that

have taken place since the proceeding was begun. The judgment is reversed and the cause is remanded with instructions to the trial court to make the further findings indicated herein and such orders, if any, as may be found necessary to protect the preferred stockholders in their rights as here defined, taking further evidence if necessary for the determination of the question.

SMITH, J. (dissenting) : I dissent from the fourth paragraph of the syllabus and from all that is said in the opinion in line therewith.

The adoption of the ordinance and the acceptance of a franchise by the corporation thereunder constituted a contract between the city and the corporation which established a test to determine whether the duty of the corporation to the public required an extension ·of its service. All subscribers to the capital stock, common and preferred, of the corporation are presumed to have subscribed thereto in view of this and all other provisions in the ordinances relating to the conduct of the business for which the franchise was granted. Moreover, the contractual test was not unreasonable unless it was unreasonable to require the corporation to meet so slight a requirement as the mere request of five persons out of a population of eight to ten thousand inhabitants of the city for such extension. Since the court finds that no such request for an extension was made, although it is to be presumed that the people of Ottawa knew the ordinance and how easily an extension of the service could have been required, the corporation ought not to be heard to say that any extensions were necessary to meet the requirements of the public service.

WEST, J., concurs in this dissent.