Fecteau, J.
These are consolidated actions by the plaintiff, Sigfried E. Meyer (“Meyer”), a minority shareholder of Toomey Associates, Inc. (“TA”), a closely-held corporation, against the corporation and the other shareholders. All of the other shareholders, with the exception of Michael Hatch,[3] are members of the Toomey family. The defendants, Maureen T. Kane (“Kane”), William G. Toomey, Jerome W. Toomey and Patrick C. Toomey, Jr., are children of Patrick C. Toomey.
*658 Meyer complains that the majority stockholders, all of whom were also employees and at times directors and officers of the corporation, were engaged in self-dealing. Myer further alleges that actions taken by the majority stockholders were detrimental to the corporation and to his interest as a shareholder. He contends that the Toomey family shareholders conducted their self-dealing through the TEKOA Realty Trust, the owner of the land and building occupied by the corporation, and whose beneficiaries are the majority shareholders themselves. Meyer alleges that the defendants accomplished their self-dealing by: {1) voting as directors and shareholders to increase the rent paid by the corporation to TEKOA, both retroactively and prospectively; (2) that they voted to pay for an addition and improvements to the building; (3) that they permitted the corporation to pay increased rent on space that the corporation itself added and paid for; and (4) that they permitted the corporation to borrow from Patrick and Eleanor Toomey, their parents, money to fund the addition and improvements at an excessive interest rate. He further alleges, that the majority shareholders/directors have breached their fiduciary duties to him as a minority shareholder. Meyer brings a derivative shareholder action on behalf of the corporation to recover amounts diverted because of self-interest and to recover his proportionate share of increased profit to which he would have been entitled on account of profit distributions in which he and other employee-shareholders participated. Meyer also seeks to have the corporation pay dividends to its shareholders instead of or in addition to performance bonuses to shareholder/employees.
The defendants deny any self-dealing, contending that all matters complained of by the plaintiff were done in good faith for legitimate business purposes of the corporation and that he consented to some of the matters of which he now complains.
Trial was held before me, sitting without jury, on August 3, 6-8, 2001. The parties were granted leave until August 30, 2001 to file requests for findings of fact and rulings of law; final arguments were heard at that time. Thereafter, the matter was taken under advisement.
Upon consideration of the credible evidence, findings of fact and rulings of law are made as follows.
FINDINGS OF FACT
1. Defendant Patrick C. Toomey (Sr.) (“Patrick”) and Eleanor H. Toomey (“Eleanor”) are the parents of defendant William G. Toomey (“Bill”), defendant Jerome W. Toomey (“Jerry”), defendant Maureen (Toomey) Kane (“Kane”), defendant Patrick C. (Chris) Toomey, Jr. (“Chris”), Jane Toomey (to whom defendant Michael E. Hatch (“Michael”) was previously married), Neil Toomey and Carmel Toomey.
2. Patrick incorporated Toomey Associates, Inc. (“TA”) in 1966 (see the TA Articles of Organization as amended (trial exhibits (“ex.”) 47 and 48)) and, at its inception, he and Eleanor were the only employees of the business.
3. TA was (and is) in the business of selling/ distributing, fabricating and repairing gauges, valves, sensors and hydraulic clamps and systems. TA does business throughout the United States, but primarily in the New England area.
4. TA was and is a closely held corporation. Until 1987, all of the stock was held by Patrick Toomey, Sr. Two of his children, Bill Toomey and Jerome Toomey, and one of his sons-in-law, Michael Hatch, worked at TA. In 1987, his daughter, Kane, joined TA as the Treasurer and President. At that time, Patrick Toomey, Sr. gifted one-half of the stock of TA to Bill Toomey, Jerome Toomey, Michael Hatch, and Kane. (Ex. 88, 89.) Patrick C. Toomey Sr. then phased out his active participation in the company. Patrick ceased being a full-time employee of TA in or about November 1992. His shares were redeemed by TA in or about September 1993, and Patrick died in November 1998. Chris, as well as Jane Toomey, Neil Toomey and Carmel Toomey, have never been shareholders of TA.
5. Since at least 1987 the offices of TA have been located in a building at 1100 Russell Road in Westfield, Massachusetts. Prior to December 1987, Patrick and Eleanor were the owners of the land and building at 1100 Russell Road where TA had its offices. The building then consisted of 3,450 square feet.
6. The Tekoa Realty Trust (“TEKOA”) was created by Patrick pursuant to a “Declaration Of Trust” on December 23, 1987 (ex. 68) for the purpose of owning the TA land and building at 1100 Russell Road. Initially Chris was the only trustee of TEKOA. During the period from approximately May 1989 to date, Chris and Kane have been the trustees of TEKOA. Since its creation to date, Kane, Bill, Jerry and Michael have been the beneficiaries of TEKOA, each having a 25% beneficial interest in TEKOA.
7. On December 26, 1987, Patrick and Eleanor sold the TA land and building to TEKOA for $150,000.00 (Quitclaim Deed (ex. 69)) in consideration of TEKOA giving Patrick and Eleanor a promissory note in the amount of $150,000 dated March 7, 1988 (“TEKOA Note” (ex. 70)). Pursuant to the TEKOA Note, TEKOA was required (among other things) to pay Patrick and Eleanor $1,416.29 (including interest at 10.50%) per month, with a final balloon payment in the amount of $128,119.45 to be paid on or about March 7, 1998 (“TEKOA Balloon”).
8: On or about March 7, 1988, TA entered into a written lease with TEKOA (“TEKOA Lease” (ex. 71)), pursuant to which the TA land and building were rented to TA. The TEKOA Lease provided that (among other things):
(a) The rent payable for the initial lease period from March 7, 1988 to March 7, 1989 was in the amount *659 of $19,417.56, which, for approximately 3450 square feet of space, is the equivalent of $5.63 per sq. ft.
(b) TA would pay “all costs of operating, maintaining, repairing or replacing the leased premises, including without limitation, all utilities, insurance, taxes and other charges related to or arising out of Lessee’s use and occupation of the leased premises, it being the intention of the parties hereto that the rent to be paid hereunder shall be net to the Lessor.”
(c) The term of the TEKOA Lease would be “automatically extended from year to year, on the same terms and conditions set forth herein except that rent payable ... for any extended term shall be mutually agreed upon by both parties."
(d) TA, as lessee, “may make structural alterations or additions to the leased premises [with the consent of the lessor). All such allowed alterations shall be at lessee’s expense . . . Any alterations or improvements made by the lessee shall become the property of the lessor at the termination of occupancy as provided herein.”
9. The initial rent was set by TEKOA and TA in an amount determined to be necessary to satisfy debt service and real estate taxes. In a contemporaneous appraisal requested by Kane, TA was advised that the market rate for such a facility was $5.00 a square foot, or $17,250 per year. (Ex. 66.) The debt service owed to the elder Toomeys under the note was $16,995.48. Thus, in 1987, the rent to be paid by TA to TEKOA was not significantly below market rent. However, due to poor cash flow during the early years of the lease, TA was not in a position to afford to save or pay additional rent to TEKOA that it could have used to establish a “capital-savings” or improvement fund, among other things, from which TEKOA would have been able to pay off the balloon payment obligation or pay for any addition or capital improvements.
10. Meyer resides in Worcester, MA, and has both an undergraduate and a Masters degree in business administration and an associates degree in mechanical engineering. Prior to his involvement with the business of the Toomeys, Meyer had significant experience in the business of valves and instrumentation, including time spent with Morgan Construction Company and Jamesbury Corporation in Worcester.
11. Kane, Bill and Jerry first met Meyer at a trade show, having been introduced by a supplier of TA. In November 1988, Meyer and TA formed Toomey Associates Engineered Systems, Inc. (“TESCO”) for the purpose of selling mechanical clamping devices, and to determine if Meyer was compatible with the TA directors and shareholders toward the end of becoming a shareholder of TA. This venture was the result of lengthy discussions between Meyer and primarily Kane of TA.
12. For a capital contribution of $50,000 in TESCO, $43,000 in cash and $7,000 as a credit for a car, Meyer became an owner of 40% of the shares of TESCO, with TA owning the balance of 60%. (Ex. 1.) Kane, Meyer and Patrick were the directors of TESCO; and Kane was the president, Meyer was the vice-president and Chris was the clerk of TESCO. TESCO was primarily engaged in the business of selling hydraulic clamping systems. Meyer was the only working employee of TESCO, with TA providing technical support and assistance. Meyer’s compensation at TESCO was $40,000, together with 40% of one half of the pretax profits of TESCO. The other 60% of one half of the pretax profits went to TA, which held 60% of the stock. Kane put this understanding in writing. (Ex. 1.) During the period it was in business from November 1988 to May 1990, TESCO was relatively successful.
13. The annual sales of TA for the fiscal year ending May 31, 1988, before Meyer arrived, was $1,563,550. TA’s sales for FY 1989, including sales through TESCO for the six months that TESCO existed during FY 1989, were $1,654,858. (Ex. 75, p. 4.) For FY 1990, during all of which TESCO was contributing to sales, TA reported annual sales of $1,943,564. Note 5 to the FY 1990 financial statement shows that $63,268 of the increase of FY 1989 over FY 1988 was inter-company sales by TA to TESCO. (Ex. 76, p. 8.) The same note shows that $254,056 of the FY 1990 sales were inter-company sales by TA to TESCO. It is inferred that Meyer was directly responsible for these inter-company sales.
14. Meyer rightfully believed that TESCO was a trial relationship, and would be followed by Meyer becoming a shareholder in TA if all agreed that there was a good working relationship through TESCO, that such a working relationship would be likely to continue through TA, and that it would be to the mutual advantage of all to do so. While the parties understood that there was no commitment by TA, both were seriously considering the advantages and disadvantages of such a relationship.
15. In or about July 1989 (approximately 6 months after TESCO had been formed), Meyer suggested that TESCO merge into TA so that he could sell other TA products. The TA directors and shareholders declined to merge at that time because they wanted TESCO to continue in business for at least a year. In November 1989 (approximately 1 year after TESCO was formed), Meyer again suggested a merger of TESCO into TA.
16. Kane apparently had concerns about Meyer’s performance and reservations about his ability to fit in with TA, although she never prepared contemporaneous documentation of any such concerns or reservations. The only contemporaneous evidence was a letter in which Kane praised Meyer’s accomplishments at TESCO and the “most successful” increased sales. (Ex. 9.) Kane, Bill, Jerry, Michael and Chris discussed the benefits and detriments of Meyer becoming a TA shareholder. Among the benefits were that Meyer had an MBA degree, had perceived technical experience *660 and managerial experience and could penetrate the sales market for TA in Eastern Massachusetts. The negative factors included the possibility that Meyer had never been employed by any company for more than 3 or 4 years, that Meyer might be unable or unwilling to learn TA’s distribution business, that his prior experience was with large corporations and he might not be able to adapt to the nature and demands of a small, family business like TA, that he had not penetrated the Eastern Massachusetts sales market for TESCO as had been anticipated, that he did not understand the necessity of maintaining the gross sales margins which were critical to TA’s business, that he may have given sales “kickbacks” to customers in the past and TA did not countenance that practice, that he was overly sensitive and that he may have had health (heart) problems. All of these issues were discussed with Meyer who indicated that he was able to overcome any perceived problems. Kane, Bill, Jerry, Michael and Chris liked Meyer on a personal level and, ultimately, agreed that Meyer would be an asset to TA and the TA “team.” Kane and the other stockholders and directors of TA unanimously approved Meyer becoming, in addition to an employee of TA, a stockholder, director, and officer at the end of May 1990.
16. Meyer joined TA in 1990 as the only non-Toomey family shareholder, director, and officer of TA. Unlike Kane, Bill Toomey, Jerome Toomey, and Michael Hatch, Meyer had to purchase his stock in TA, although each had acquired “sweat equity” from their labors for the company. He had lengthy discussions with Kane about the price to be paid for his stock. She obtained a valuation formula from the company’s accountant, which she gave to Meyer. That formula included a 15% discount for a minority interest in a closely held corporation (Ex. 4), and a 25% premium based on expected future value. (Ex. 5.) Eventually, she and Meyer agreed that Meyer, in exchange for $50,000 and his TESCO stock for which he had already paid $50,000, would receive 32 shares of stock in the company, the equivalent of an 8% interest in TA. This agreement was approved by the other stockholders and directors of TA. (Ex. 50.) TESCO was merged into TA, all of the shares of TESCO were cancelled and the business of TESCO was thereafter conducted by TA.
17. Before Meyer became a shareholder, officer and director of TA, Kane had in excess of 20 hours of conversations with him regarding (among other things) the financial condition of TA and the manner in which TA was operated. Among the specific topics which Kane discussed with Meyer were: (1) the concerns which the TA shareholders and directors had regarding Meyer becoming a shareholder of TA (supra); (2) the manner in which the 8% interest which Meyer would acquire in TA was calculated, including the fact that Meyer would be paying a premium for such 8% interest (see Paragraph 3 of the March 28, 1990 Letter of Intent which was signed by Meyer (ex. 5)); (3) that Meyer would become the vice-president of marketing with responsibility for (among other things) managing all of the sales of TA, penetrating the Eastern Massachusetts market and attending strategic planning meetings; (4) initially Meyer would be paid a salary of $40,000; (5) that Meyer’s stock in TA would not be liquid or easily redeemable, a fact that he acknowledged at trial; (6) that if liquidity were important to Meyer he should not invest in TA; (7) that Meyer would be required to sell his TA shares in accordance with the procedure set forth in the TA Shareholders’ Agreement; (8) that the open management system and style of TA created the need for Meyer to be independent and a “self-starter”; (9) that, if Meyer did not trust the TA directors and shareholders, he should not invest in and become a shareholder of TA; (10) that Meyer should obtain independent legal and accounting advice in connection with becoming a shareholder of TA and with respect to the TA Shareholders’ Agreement; (11) the relationship between TA and TEKOA and the manner in which the rent to TEKOA was determined (discussed below); (12) the nature and amount of TA’s loans; (13) the benefits Meyer would receive as an employee of TA; (14) the manner in which bonuses at TA were determined and paid (discussed below); and (15) that if Meyer did not become a shareholder of TA he could continue as an employee of TA after the merger of TESCO into TA.
18. Before he became a shareholder, Kane gave Meyer (among other things) the complete financial statements of TA for the years 1986 to 1989 and the TA Shareholders’ Agreement. (Ex. 52.) In addition, Meyer was permitted to review any documents which he requested relating to the finances and operations of TA. Meyer was not precluded from reviewing any TA documents. Shortly after becoming a shareholder of TA, Meyer saw a copy of the TA By-laws. (Ex. 49.) Additionally, Kane told Meyer that TA was a tenant of TEKOA, that the amount that had been agreed upon for payment of rent was only meant to meet the debt service owed to the Toomey parents under the note, that it was low due to the current cash-flow position of TA and that it may later be adjusted to be more consistent with a market-rent. I infer that such discussion concerning a rent adjustment was prospective. Meyer did not consult either an attorney or an accountant prior to his signing the shareholder agreement. There was no discussion beforehand as to the manner in which shares could be redeemed or the method of valuation. Meyer was not told that the method of valuation at redemption would be the same as that at purchase.
19. During the period from May 1990 (when Meyer became a shareholder of TA) to November 1993, the following individuals owned the following approximate percentages of TA stock:
Patrick 46.0%
Bill 11.5%
Jerry 11.5%
Kane 11.5%
Michael 11.5%
Meyer 8.0%
*661 20. In November 1993, the TA shares of Patrick were redeemed, and thereafter and continuing to date, the following individuals have owned the following approximate percentages of TA stock:
Bill 21.3%
Jerry 21.3%
Kane 21.3%
Michael 21.3%
Meyer 14.8%
21. During the period while the plaintiff was an employee and director (“Meyer Period”), the directors of TA were:
Patrick (until September 29, 1993)
Bill (as of September 17, 1991)
Kane
Chris
Meyer (until July 7, 1994).
22. During the Meyer Period, the officers of TA were:
Kane (president from May 1990 until May 31, 1991, and treasurer from June 1, 1991 to date)
Bill (president from June 1, 1991 to date)
Chris (clerk from May 1990 to date)
Meyer (vice-president of marketing until June 24, 1994).
23. During the Meyer Period, TA had approximately 12 employees (including Meyer, Kane, Bill, Jerry and Michael). For the 1990 (annualized), 1991, 1992 and 1994 (annualized) calendar years, Meyer received a higher salary (including bonuses) than any other TA employee/shareholder. For the 1993 calendar year, Meyer received a higher salary than Kane. TA Salaries Chart. (Ex. 91.)
24. Commencing in or about December 1990, the TA directors and shareholders discussed and thereafter agreed to:
(a) Construct an approximate 600 square foot addition to the TA building to be used as a shipping and receiving area (“Addition”) because more space was needed for shipping and receiving activities which, before the Addition was constructed, were being performed in the TA shop area.
(b) Improve the TA building by constructing an approximate 825 square foot area for an upstairs mezzanine for record and inventory storage and converting a part of the existing shop area to office space, a kitchen area and a conference room (“Improvements”). The Improvements were proposed because the office areas at TA were overcrowded, more space was needed for inventory and record storage, and a conference room was needed for meeting with suppliers and customers. This mezzanine was later expanded.
(c) Purchase (among other things) new desks, telephones, video equipment, shelving, computers and carpeting (“Equipment”). This was paid for by TA. The Addition and the original and expanded mezzanine were also paid by TA. As a result of the Improvements, the square footage of the building increased from 3,450 square feet to 5,480 square feet. (Ex. 99.)
25. The construction of the Addition and the Improvements, and the purchase of the Equipment, was discussed with Meyer on numerous occasions. Meyer agreed, and did not.object to TA constructing the Addition or the Improvements. Meyer also did not object to TA purchasing the Equipment, to the nature and type of addition, or to the improvements or equipment. Meyer recognized the necessity for TA to take these steps and the value to TA in all of these projects. Further, the equipment purchases were solely related to the business interests of TA and that TEKOA received no value for the equipment purchases.
26. The Addition and the Improvements were constructed by TA, and the Equipment was purchased by TA during the approximate period from July 1991 to June 1992. TA paid approximately $20,545 for the construction of the Addition, $25,946 for the construction of the Improvements, and $29,020 for the Equipment, for a total of $75,511. TA paid for the Addition, Improvements and Equipment by no later than February 1992. Leasehold improvements carried as an asset on the financial records of TA are depreciable over time, as opposed to maintenance expenses which are deducted in the year the expense is incurred. During the reporting year of 1992, the financial records of TA show an increase in the value of leasehold improvements of approximately $55,000.00.
27. During the approximate period from August 1991 to April 1992, Patrick and Eleanor advanced $74,070 to TA in order to fund TA’s payment for the Addition, Improvements and the Equipment. On or about June 1, 1992, TA, by Kane, gave Patrick and Eleanor promissory notes in the amounts of $54,070 (TX-14) and $20,000 (TX-15) (“TA Notes”) in consideration for the prior advances made by them for the Addition, the Improvements and the Equipment. Pursuant to the TA Note in the amount of:
(a) $54,070, TA was required to pay Patrick and Eleanor $692.27 per month (including interest at the annual rate of 9.25%), with a final balloon payment in the amount of $33,155.26 to be paid in or about June 1997. (Ex. 14.)
(b) $20,000, TA was required to pay Patrick and Eleanor $256.07 per month (including interest at the annual rate of 9.25%), with a final balloon payment in the amount of $12,263.41 to be paid in or about June 1997, at or about the same time that repayment of the $150,000.00 loan for the purchase by TEKOA of the real property was due to the elder Toomeys. TA paid the TA Notes in full by June 1, 1997.
*662 28. The 9.25% interest rate of the TA Notes was based upon the interest rate which the Bank of Boston would have charged TA for a loan in the amount of $70,000 in July 1991. At the time the Addition and Improvements were being planned, Kane obtained a commitment from the Bank of Boston for these costs. (Ex. 55.) During relevant times, TA had an ongoing banking relationship with the Bank of Boston, which provided general banking services, a revolving line of credit and an installment loan to TA.
29. The TA Notes did not contain a prepayment provision and, accordingly, could not be prepaid by TA unless Patrick and Eleanor agreed to such prepayment. However, the terms of the TA Notes were more favorable for TA than the terms which would have existed had TA obtained a loan in or about June 1991 from the Bank of Boston in the amount of $70,000 to pay for the cost of the Addition, Improvements and the Equipment because:
(a) The interest rate which the Bank of Boston would have charged for the loan would have been the same as the interest rate contained in the TA Notes (9.25%).
(b) TA would have been required to begin repaying the Bank of Boston loan in or about July 1991, whereas TA was not required to begin repaying the TA Notes until June/July 1992 (thereby facilitating •TA’s cash flow).
(c) The Bank of Boston loan may have created a cash flow problem for TA because TA would have been required to make principal payments in the amount of $1,250 per month (plus interest payments starting at in excess of $500 per month), whereas TA was only required to make principal and interest payments in the amount of $948.34 per month with respect to the TA Notes.
(d) The TA shareholders would have been required to guarantee the Bank of Boston loan, whereas the TA shareholders were not required to guarantee the TA Notes.
(e) TA would have been required to repay the Bank of Boston loan by February 1996, whereas the TA Notes did not have to be repaid until June 1997.
(f) TA would only have been able to borrow $70,000 from the Bank of Boston, whereas the TA Notes were in the amount of $74,070. (TX-14 and 15.)
30. It would not have been prudent for TA to have used its Bank of Boston “Business Edge Credit Line” (ex. 56): (a) to pay for the cost of the Addition, Improvements and the Equipment instead of borrowing from and issuing the TA Notes to Patrick and Eleanor and/or (b) to repay (or refinance) the TA Notes (assuming Patrick and Eleanor would have agreed to such prepayment) because:
(a)TA would have improperly been using short-term debt to finance a long term capital improvement.
(b) In accordance with the terms of the Bank of Boston line of credit TA would have been required to repay the entire outstanding line of credit within one (1) year, whereas there was no such requirement with respect to the TA Notes.
(c) In accordance with the terms of the Bank of Boston line of credit the Bank of Boston would have had the right to “call” the line of credit at any time, whereas there was no such right with respect to the TA Notes.
(d) In accordance with the terms of the Bank of Boston line of credit the interest rate with respect to the Bank of Boston line of credit would have “floated” and, therefore, could have increased to an interest rate which was higher than the fixed 9.25% interest rate contained in the TA Notes. (Ex. 56.)
31. During the Meyer Period, TA did not attempt to obtain a loan from the Bank of Boston to repay (or refinance) the TA Notes (assuming Patrick and Eleanor would have agreed to such prepayment) because it was believed that any such loan would have had the same terms which were set forth in the June 6, 1991 Bank of Boston letter to Kane (ex. 55) which were less favorable to TA than the terms of the TA Notes.
32. During the Meyer Period, TA did not attempt to obtain a loan from a bank other than the Bank of Boston to repay (or refinance) the TA Notes (assuming Patrick and Eleanor would have agreed to such prepayment) because:
(a) It would have been impractical for TA to establish a loan relationship with a new bank because of the unique nature of TA’s business which had been monitored and supported by the Bank of Boston since the late 1980s.
(b) A new loan relationship may have jeopardized TA’s existing loan relationship with'Bank of Boston which was favorable to TA because (among other things) the Bank of Boston gave TA immediate credit or a “float” on third-party checks and free access to Dun & Bradstreet information and reports (thereby facilitating TA’s cash flow and strengthening its credit policy).
33. Based upon monthly TA financial reports and information which were given to him, Meyer was aware that TA had borrowed money from Patrick and Eleanor at 9.25% during the period August 1991 to April 1992 to finance the construction of the Addition and Improvements and to purchase the Equipment, and Meyer did not object to the same. On or about September 17, 1991, Meyer signed a “Joint Consent Action Of The Board Of Directors And Stockholders Of TA, Inc. In Lieu Of 1991 Annual Meeting” (ex. 58) which resolved that “all actions taken by the officers of the Corporation [TA] and/or the Board of Directors thereof since the date of the last annual meeting [September 17, 1990 (ex. 57)] be, and hereby are, fully ratified, approved and confirmed in all respects.” Meyer never *663 requested that TA repay the TA Notes by obtaining a loan from the Bank of Boston or any other bank and never made a formal motion at a TA directors or shareholders meeting that TA repay the TA Notes with a loan from the Bank of Boston or any other bank or with TA’s line of credit. The $70,000.00 loan and promissory notes with the elder Toomeys was not motivated out of an interest or desire on the part of any one or all of their children to provide them with a higher-than-market interest rate. Notwithstanding that variable rates available to commercial borrowers had dropped to as low as 6% during the relevant time, there were sound business reasons for not re-financing this indebtedness.
35. Commencing in or about November 1992, the TA directors and shareholders began discussing whether, because the cash flow of TA had improved and stabilized, the rent which TA paid to TEKOA should be increased in order to pay a rent to TEKOA that more closely approximated fair market rent existent for that time. At the same time, discussions were held concerning the balloon payment obligations owed to the Toomey parents, namely, the $150,000.00 mortgage on the real property owed by TEKOA and the $70,000.00 loan for the addition, improvements and equipment, both of which would become due in June 1997. (Ex. 59.) These discussions continued consistently through the next six months at shareholder, director and senior management meetings at which all of the parties, with the exception of Patrick Toomey, .Sr., participated.
36. At the request of Meyer and Chris, in November 1992, Kane prepared and gave to the TA directors and shareholders, including Meyer, a document (ex. 17) indicating the amounts of the balloon payments which were due to Patrick and Eleanor pursuant to the TA Notes (“TA Balloon”) and pursuant to the TEKOA Note (“TEKOA Balloon”), together with a “sinking fund” formula indicating the approximate amount ($2,677) which would have to be set aside each month in order to pay the TA Balloon and the TEKOA Balloon when they became due.
37. After further discussions among the TA directors and shareholders, Kane was requested by Meyer and Chris to analyze methods by which the TA Balloon and the TEKOA Balloon could be paid by TA, understanding that only the TA balloon was an obligation, at that time, of TA, while the TEKOA balloon was an obligation of TEKOA. Indirectly, however, it was and is clear that the trustees and beneficiaries of TEKOA intended to pass through to TA as much of TEKOA’s financial obligation as they could lawfully do. In December 1992, Kane prepared and gave to the TA directors and shareholders Option A and Option B. (Ex. 20A.) Although characterized as “options,” Option A and Option B merely represented separate analyses and were not intended as exclusive “options” or alternatives for the payment by TA of the TA Balloon and the TEKOA Balloon.
38. Option A represented the after-tax cost to TA ($259,415) if both the TA Balloon and the TEKOA Balloon were paid. After Option A was reviewed and discussed by the TA directors and shareholders in December 1992, it was eliminated as an “option” because all the TA directors and shareholders agreed that TA could not properly pay the TEKOA Balloon since: (a) it was an obligation of TEKOA (not TA), (b) it was believed that it would be improper under existing IRS rules to establish a sinking fund for such purpose, and (c) in any event, the cash flow of TA was not sufficient to permit TA to establish a sinking fund to pay the TEKOA Balloon. After Option A was eliminated, there was no further discussion by the TA directors and shareholders about TA paying the TEKOA Balloon.
39. Option B represented the after-tax cost to TA ($185,255) if (in accordance with the discussions regarding the rent, infra) a retroactive rent payment in the amount of $46,667 were paid to TEKOA, rent to TEKOA were increased prospectively for 60 months and the TA Notes were transferred to TEKOA.
40. In or about May 1993, Kane calculated and proposed a rent of the TA building and land to be paid retroactively for the period from April 1989 to May 1993 and calculated and proposed a rent of the TA building and land as of June 1, 1993, to be paid prospectively. The calculation of rent for payment retroactively based upon information in appraisals dated February 20, 1987 (ex. 66) and December 15, 1987 (ex. 67), prepared by Smith & Reynolds. It was suggested that a new appraisal be obtained for purpose of calculating the Retroactive Rent Payment, but Meyer opposed spending the money to obtain a new appraisal and said that the existing 1987 appraisals would be sufficient. The December 1987 appraisal did not contain a rental value for the TA building and land. Therefore, a retroactive rent payment in the amount of $40,936 was calculated by: (a) determining the fair market value of the TA land and building as of February 1987 ($150,000) based upon the February 20, 1987 appraisal (ex. 66, Page 7), (b) determining the fair market value of the TA land and building as of December 1987 ($210,000) based upon the December 1987 appraisal (ex. 67, Page 2), (c) determining the percentage fair market value increase of the TA land and building from February to December 1987 (140% ($210,000 divided by $150,000)), (d) multiplying the annual rental income amount of $21,750 in the February 1987 appraisal (ex. 66, Page 6) by 140%, which resulted in an annual rental amount of $30,450 and a monthly rental amount of $2,537.50, (e) multiplying the monthly rental amount of $2,537.50 times the 50-month retroactive rent period (April 1988 (the first full month after the first year of the TEKOA Lease)) to May 1993 ($126,875), and (f) subtracting the average *664 monthly rent and taxes ($1,718.78) which TAhad paid TEKOA during the 50-month retroactive rent period ($85,939).
41. The Retroactive Rent Increase was equivalent to TA paying $8.82 per square foot ($2,537.50 per month times 12 months divided by 3,450 square feet). The Retroactive Rent Increase was based upon the square footage of the TA building before the Addition and Improvements were constructed, or 3,450 square feet.
42. The rent proposed to be paid prospectively was calculated based upon information obtained by Kane from the TA accountants that warehouse space was renting for $3 per square foot and office space was renting for $10 per square foot; she concluded that an appropriate rent for the TA building would be $7 per square foot. Therefore, the Prospective Rent Increase in the annual amount of $40,068 (or $3,339 per month) was calculated by multiplying the square footage of the TA building after the Addition had been constructed (5,724) times $7 per square foot.
43. Kane discussed the Retroactive Rent Payment and the Prospective Rent Increase calculations with the other TA directors and shareholders, including Meyer, in May 1993. Based upon the continuing discussions about the Retroactive Rent Payment, the Prospective Rent Increase and the transfer of the TA Notes to TEKOA, and because (notwithstanding the recommendation of TA’s accountants against transferring the TA Notes) Meyer wanted the TA Notes transferred to TEKOA in connection with the Retroactive Rent Payment and the Prospective Rent Increase, Chris prepared a May 10, 1993 TA “Unanimous Written Consent Of The Board Of Directors” (ex. 61) (“May 10, 1993 Consent”) which provided for a Retroactive Rent Payment of $46,667.04 (mistakenly based on the amount in Option B rather than the amount in the Analysis 5/93), a Prospective Rent Increase of $40,068 and the transfer of the TA Notes to TEKOA.
44. Meyer refused to sign the May 10, 1993 Consent. He wrote some reasons for his objections in a May 22, 1993 memorandum from him to Bill. (Ex. 27.) He was opposed to any retroactive rent payment since there was no legal obligation to do so, that he was never informed of TA’s intent to do so during the time that he was considering becoming a shareholder of TA and that such a payment would lessen the amount of potential profit for distribution as bonuses. He also had objected to TA having to pay an increased rent to TEKOA on space that TA had completely paid for through its borrowing from the elder Toomeys, unless TEKOA was going to assume the liability to the Toomeys for the borrowing.
45. When Meyer did not sign the May 10, 1993 Consent, a formal TA directors meeting was held on May 28, 1993 via a telephone conference (with Meyer, Kane and Bill in the TA conference room on a speaker phone talking with Chris in Boston) because the TA directors and shareholders other than Meyer wanted to resolve the Retroactive Rent Payment and Prospective Rent Increase issues before the end of the fiscal year on May 31, 1993. At the May 28, 1993 directors meeting Kane indicated that she had not yet determined from the accountants what it would cost TA if the TA Notes were transferred to TEKOA, again stated the reasons the TA accountants had recommended against transferring the TA Notes to TEKOA, and reiterated that TA’s accountants had stated that the Retroactive Rent Payment could not be amortized. At the meeting, Meyer raised none of the issues which were contained in his May 22, 1993 memorandum to Bill. (Ex. 27.)
46.At the May 28, 1993 meeting a motion was made and seconded that:
(a) TA make a retroactive rent payment in the amount of $40,936 “representing the difference between fair market rent for the premises demised pursuant to the [TEKOA] Lease and rent paid by . . . [TA] for the period March 8, 1989 [sic should be April 1, 1989] through and including May 31, 1993.” In contrast to the May 10, 1993 Consent, the Retroactive Rent Payment motion at the May 28, 1993 meeting was not tied to or conditioned on TA transferring the TA Notes (and leasehold improvements) to TEKOA because the only reason the transfer was contained in the May 10, 1993 Consent was at the request of Meyer and, since Meyer had not signed the May 10, 1993 Consent and the TA accountants had recommended against the transfer, the majority believed that there was no longer any reason to make the transfer a part of the Retroactive Rent Payment. Kane, Bill and Chris voted in favor of the motion, and Meyer voted against the motion. The only reason stated by Meyer at the May 28, 1993 meeting for voting against the motion and reflected in the minutes of that meeting was that the retroactive rent payment was not being amortized. Conversely, Meyer did not state at that time that he was voting against the retroactive rent increase because it was not conditioned on the transfer of the TA Notes to TEKOA (nor did he make a formal motion to that effect). May 28, 1993 TA “Minutes Of Board Of Directors.” (Ex. 62.) However, his position had been made clear to the other shareholder / directors at prior meetings and he did not waver in his opposition.
(b) TA make a prospective rent increase in the amount of $3,339 per month (or 40,068 per year). In contrast to the May 10, 1993 Consent, the Prospective Rent Increase motion at the May 28, 1993 meeting was similarly not tied to or conditioned on TA transferring the TA Notes and leasehold improvements to TEKOA because the only reason the transfer was contained in the May 10,1993 Consent was at the request of Meyer and, since Meyer had not signed the May 10, 1993 Consent and the TA accountants had recommended against the transfer, there was no longer any reason to make the transfer a part of the Prospective Rent Increase. Kane, Bill and Chris voted in favor of the *665 motion, and Meyer also voted in favor of the motion. Meyer did not state at the May 28, 1993 meeting that he was voting in favor of the Prospective Rent Increase based upon the assumption that it was conditioned on the transfer of the TA Notes to TEKOA, nor did he make a formal motion to that effect, believing that such a step would be futile, and believed and so stated that he had no problem with TA paying TEKOA a fair market rent for the premises demised pursuant to the [TEKOA] lease for future years. May 28, 1993 TA “Minutes Of Board Of Directors” (ex. 62). However, he did not believe that TEKOA should receive an increase in rent for space that was built at TA’s expense and that would be carried as an asset of the corporation.
47. Although Meyer voted against ratifying, approving and confirming the actions of the TA officers and directors since the last annual meeting at the September 29, 1993 TA joint stockholders and directors meeting, he voted in favor of re-electing Bill as the president, Kane as the treasurer and Chris as the clerk of TA.
48. There was no provision in the lease (Ex. 71) to make a retroactive payment for deferred rent or below market rent. There is no note in the TA financial statements through 1992 which discloses that there was any obligation to make a retroactive payment for deferred rent or below market rent. Effective as of June 1, 1993, a “First Amendment To [the TEKOA] Lease” was executed (TX-73) which amended the TEKOA Lease to provide for the payment of the retroactive rent payment and the prospective rent increase. There was no obligation in the original lease or in the amendment for TA to pay rent to the lessor for additions to the premises made at the expense of the lessee. TA made the Retroactive Rent Payment to TEKOA on or about May 28, 1993. TA has paid rent to TEKOA in the amount of the Prospective Rent Increase ($40,068 per year) from June 1, 1993 to date.
49. Before Meyer became a shareholder of TAin May 1993, Kane told Meyer that:
(a) The bonuses at TA were determined in the discretion of the president based upon the performance of the employee, the current and future cash flow requirements of TA, the capital requirements of TA and the ratios and requirements of the Bank of Boston.
(b) Although in the past TA employee/shareholders who were working full time had received bonuses in the same amounts and the total bonuses to such employee/shareholders were approximately 50% of the earnings before taxes of TA, and notwithstanding Meyer’s understanding that such was a formal bonus arrangement at TA as it had been at TESCO, there was no guarantee that the amount of the bonuses which would be paid to full-time employee/shareholders of TA in the future would be in equal amounts or that the total bonuses would be equivalent to 50% of TA’s earnings before taxes.
(c)An employee of TA is only entitled to receive a bonus if s/he is an employee of TA at the end of the fiscal year of TA when the bonuses are paid (Kane Testimony), and Meyer admitted that he was told about such eligibility requirement.
50. There was no formal, written bonus policy at TA as there had been at TESCO.
51. During the Meyer Period, TA did not distribute 50% of its earnings before taxes as bonuses. Thus, the percentage of TA’s earnings before taxes which were paid as bonuses to TA employee/shareholders for the fiscal year ending:
(a) May 31, 1991: 45%
(b) May 31, 1992: 30%
(c) May 31, 1993: 0%
(d) May 31, 1994: 45%
52. TA did not pay bonuses to employee/shareholders according to their pro rata stock interest in TA since (among other things):
(a) After 1987 Patrick received no bonuses, although he was a 46% shareholder of TA.
(b) For the fiscal years ending May 31, 1991 and May 31, 1992, Meyer received the same bonuses ($14,000 and $5,000, respectively) as Kane, Bill, Jerry and Michael, although Meyer was only an 8% stockholder and Kane, Bill, Jerry and Michael were each 11.5% stockholders, (c) For the fiscal year ending May 31, 1994, had Meyer received a bonus based upon his (then) 14.8% stockholder interest in TA, he would have received a bonus in the amount of $9,457 (.148 times $63,900) and Kane, Bill, Jerry and Michael with their 21.3% stockholder interests would have received bonuses in the amounts of $13,610 (.213 times $63,900), whereas Meyer only received a $7,900 bonus and Kane, Bill, Jeriy and Michael received bonuses in the amounts of $14,000.
53. During the Meyer Period, if TA paid bonuses to employee/shareholders, TA also paid bonuses to employees who were not TA shareholders. TA has never paid a dividend to any shareholder of TA. The bonuses paid to TA employee/shareholders are not considered dividends because:
(a) TA deducted the bonuses which were paid, and dividends are not deductible.
(b) Neither the TA accountants nor the IRS has ever indicated that the bonuses which were paid by TA should have been considered to be dividends.
(c) The bonuses which were paid by TA did not decrease TA shareholders’ equity “dollar for dollar," whereas dividends would have decreased shareholders’ equity dollar for dollar.
(d) Patrick received no bonuses after 1987, but would have as a 46% shareholder if TA’s bonuses constituted dividends.
*666 (e) TA paid bonuses before the end of the TA fiscal year, whereas dividends would be paid after the end of the fiscal year.
(f) TA paid bonuses to employees who wére not shareholders of TA.
(g) Since the point in time that Kane ceased her employment with TA as the controller of TA, she has received no bonuses.
(h) TA bonuses were not paid based upon the pro rata shareholder interest of employee/shareholders in TA {supra).
54. On October 23, 1993, while still employed by TA, the plaintiff filed his first action against the individual defendants, making direct claims for monetary and injunctive relief for alleged breach of their duty to him as a minority shareholder and director and for improperly diverting corporate assets to pay increased rent, costs of improvements and excessive interest for the personal benefit of the individual defendants.
55. In these consolidated actions, Meyer is not complaining about the amount of the bonuses he received in the TA fiscal years ending on May 31, 1991 or on May 31, 1992. For the TA fiscal year ending on May 31, 1993, no bonuses were paid to any employee/shareholder since, among other things, it was anticipated that TA would need cash in order to redeem the TA shares of Patrick and possibly Meyer, in addition to having decided to make a retroactive rent payment. Bonus Chart (ex. 92A); see November 11, 1992 TA “Minutes Of Meeting Of The Board Of Directors” (ex. 60), January 29, 1993 Meyer to Bill letter (ex. 22).
56. For the TA fiscal year ending on May 31, 1994, the following bonuses were paid to the following employee/ shareholders:
Meyer $7,900
Kane $14,000
Bill $14,000
Michael $14,000
Jerome $14,000
Bonus Chart. (Ex. 92A.)
57. The bonus paid to Meyer for the TA fiscal year ending on May 31, 1994 was $6,100 less than the bonuses paid to each other employee/shareholder. As president, Bill discussed with Meyer on occasions during the period June 1993 through December 1993, that Meyer was not performing his employment duties and responsibilities as well as the other employees/shareholders. Among other reasons expressed for TA paying Meyer a reduced bonus were that Meyer was not achieving his sales goals, was not making sales calls, had not penetrated the Eastern Massachusetts market as was anticipated, had not learned the TA computer system which contained information critical and necessary to Meyer’s job responsibilities, was not following up on sales calls, was not preparing quotes and reports and was not participating in or preparing for TA strategic planning meetings. As a result, Bill, Jerry and Michael were said to be performing many of Meyer’s job responsibilities. Bill communicated his criticism of Meyer to him in writing only one time, in December 1993, to which Meyer responded.
58. Consequently, Meyer was paid a bonus of $ 1,000 for having achieved only 90% of sales goals and was paid an additional $6,900 because Bill believed that he was only expending V2 of the effort of the other employee/shareholders. Bonus Chart (ex. 92A): December 17, 1993 Bill to Meyer letter. (Ex. 37.)
59. For the fiscal year ending June 30, 1994, TA’s gross sales had increased to $2,912,026.00, representing almost a doubling of its income during the years that Meyer was employed by TESCO and TA.
60. TA did not directly pay Meyer his full bonus for the fiscal year ending on May 31, 1994 in the amount of $7,900. Meyer was paid the amount of $701.90 ($1,000 less payroll deductions of $298.10). After conferring with counsel, it was decided by one or more of the defendants to impound the balance of $4,855 ($6,900 less payroll deductions), in the nature of a self-help attachment, in an interest-bearing account in the name of Meyer pending a final decision in these consolidated actions for the following stated reasons:
(a) TA contends that the 1993 Action (which was commenced before the bonuses for the TA 1994 fiscal year were paid) was frivolous because Meyer improperly failed to proceed by means of shareholders’ derivative action and, as a result, Meyer may be liable for the attorneys fees, costs and expenses incurred by defendants pursuant to M.G.L.c. 231, Section 6F (requested by defendants in their answer to the 1993 Action complaint). In addition, after the bonuses for the TA 1994 fiscal year were paid, TA filed an action against Meyer for damages on the ground, among other reasons, that Meyer breached his fiduciary duty to TA by working for a competitor (Washburn-Garfield Corporation) while he was still a director and shareholder of TA. See the June 30, 1994 Chris to Washburn-Garfield letter. (Ex. 39A.)
(b) The defendants also questioned the financial ability of Meyer to pay such attorneys fees, costs and expenses if they were to be awarded to the defendants (or to pay any judgment which may have been obtained by TA in its action against Meyer).
61. Meyer was not informed of the decision to pay him a bonus of less money than the others receiving a bonus, nor the decision to impound most of the amount, until 1995 when he received his W-2 statement for the 1994 tax year, and about which he made inquiry.
62. In January 1993 Meyer advised TA that he wanted to sell his shares in TA. He reiterated that request in June 1993 and September 1993, but was unwilling to sell his shares pursuant to the same valuation formula which was used to redeem the *667 shares of Patrick. January 29, 1993 Meyer to Bill letter (ex. 22); June 25, 1993 Meyer to Bill letter (ex. 29); September 29, 1993 TA “Minutes Of Joint Meeting Of Stockholders And Board Of Directors.” (Ex. 64.) He objected to the formula for valuation upon sale by which a double discount, on sale, for lack of marketability and his minority interest was applied, whereas on purchase, a premium had been charged. (Ex. 5, 34 and attachment.) While the TA did purchase the stock of Patrick Toomey, Sr. in accordance with that formula for valuation, that repurchase can be viewed, at least in part, as a continuation of a transfer of assets from Patrick Toomey, Sr. and his wife to their children. He had already gifted half of the stock to them, and had loaned them the money to purchase the real estate.
63. Without advising anyone at TA, and after the decisions were made to pay a retroactive rent increase, and a prospective rent increase on all the space, and after the shares of Patrick Toomey, Sr., were redeemed, Meyer began looking for another job in late summer or early fall of 1993. The plaintiff resigned his office of vice president and his employment as a salesman in June 1994, and resigned as a director in July 1994. He began employment with the Washburn-Garfield Company thereafter. Washburn-Garfield Corporation is engaged in the business of selling, distributing, designing and assembling gauges, valves and related instruments and systems for the monitoring and control of liquids and gases primarily in the New England area or market and, as such, was a competitor of TA in some product lines. JPM (Agreed Facts (Appendix A)) (ex. 88, at Paragraph 7).
64. Since the point in time that Meyer ceased his employment with TA, he, as a shareholder, has not received any dividends. The only shareholders of TA, with the exception of Meyer and Kane, are also employees.
65. On October 7, 1997, the plaintiff filed an amended complaint that, in addition to asserting his original direct claims against the individual defendants, made a claim regarding the bonuses paid in 1994 and thereafter, as well as making purportedly a derivative claim against them on behalf of the corporation.
66. On May .13, 1998, the plaintiff filed a new lawsuit against the defendants, incorporating all claims previously made but as shareholder derivative claims only.[4]
RULINGS OF LAW
I. Introduction
The plaintiff contends that, as a minority stockholder in a close corporation wherein the majority interest is controlled by members of the same family, he has suffered direct and indirect financial loss due to self-dealing on the part of the majority. In chronological order, the plaintiff complains of the following actions taken by the majority detrimental to the corporation and to his interest as a shareholder:.
(1) from August 1991, to April 1992,[5] TA, Inc., borrowed from Patrick and Eleanor Toomey approximately $74,000.00 in order to pay for an addition and improvements to the real property occupied by TA and for equipment purchases being made by TA and deemed necessary for its needs; the plaintiff contends that the corporation agreed to repay these loans at an excessive rate of interest;
(2) in May 1993, the corporation decided to pay its lessor, TEKOA Realty Trust,
(a) a retroactive rent increase for the original space leased from it, which had the detrimental effect on his interest that $40,936.00 was removed from potential profits from which bonuses could be paid; and
(b) to pay an increased rent prospectively and based upon the original space and the additional space created by the addition and improvements added and paid for by the corporation, having the impact that the corporation was being made to pay to rent space that it built and paid for from funds that would otherwise be potentially available to pay bonuses;
(4) in May 1994, the corporation decided to pay him a bonus-of approximately one-half of that paid to the other shareholders, and, to withhold all but $1000.00 of that, less tax withholding, in the nature of a self-help attachment;
(5) since leaving his employment with the company in July 1994, he has not received any dividends or actual return on his shareholder interest of any kind.
First, there is no question but that TA, Inc., is a close corporation. In a close corporation, the controlling stockholders have a duty of utmost good faith and loyalty to the minority stockholder. This is a fiduciary duty, akin to the fiduciaiy obligation of a partner. See Donahue v. Rodd Electrotype Co., 367 Mass. 578 (1975). However, it is not improper, per se, for majority shareholders in a close corporation (like TA) to cause the corporation to enter into transactions with themselves or entities controlled by them. It is similarly not improper for directors and officers of a close corporation to cause the corporation to enter into transactions with themselves or entities controlled by them. However, directors and officers of a corporation likewise have a fiduciary duty to act with utmost good faith in a manner which they reasonably believe to be fair and in the best interests of the corporation. Accordingly, directors and officers may only be liable for a breach of fiduciary duty if it is established, by a preponderance of the evidence, that the challenged transaction was either unfair, made in bad faith (or made with conscious knowledge of wrongdoing) or not made with reasonable intelligence.
*668 A minority stockholder has a direct cause of action against the majority stockholders who breached their duty. See Merola v. Exergen Corp., 38 Mass.App.Ct. 462, 471-72 (1995). Upon proof of the breach, the court’s equitable powers are uniquely suited to fashion appropriate remedies to put the minority stockholder in the position which he would have occupied if there had been no breach. See Zimmerman v. Bogoff, 402 Mass. 650, 661 (1988). Equitable remedies may include requiring the majority stockholders to repay with interest what they removed from the corporation, or to require the corporation to make payments to the minority stockholder. See Donahue, supra, at 603-04.
Nevertheless, because strict application of such a standard could result in limiting legitimate corporate action and interfering with the effective management of the corporation, majority shareholders are permitted a large measure of discretion and latitude in conducting the business of the corporation. Therefore, when a minority shareholder alleges that an action taken by the majority shareholders constitutes a breach of fiduciary duty, the action must be carefully analyzed to determine whether there was a legitimate business purpose for the action. If a legitimate business purpose exists, then in order to establish a breach of fiduciary duty, the minority shareholder must demonstrate, by a preponderance of the evidence, that the legitimate business purpose could have been achieved by means of a less harmful, reasonably practicable alternative which would have been just as beneficial to the corporation. See Donahue, supra, at 578: Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842 (1976); Leader v. Hycor, Inc., 395 Mass. 215 (1985); Smith v. Atlantic Properties, Inc., 12 Mass.App.Ct. 201 (1981); Zimmerman v. Bogoff, 402 Mass. 650 (1988).
II. Claims
A. Excessive Interest
Discussing the plaintiff s complaints in the chronological order in which the corporate decisions arose, then, and turning first to his “excessive interest claim”, it was not improper or a breach of fiduciary duty for defendants to cause TA to (i) not obtain a loan in or about June 1991 (or thereafter) from the Bank of Boston or any other bank, or not use TA’s line of credit, to pay for the Addition, the Improvements and the Equipment, instead of obtaining loans from and issuing the TA Notes to Patrick and Eleanor, and/or (ii) not repay the TA Notes with a bank loan or TA’s line of credit, because such decisions were made in good faith and for legitimate business reasons relating to the respective terms of the TA Notes, the bank loans and the TA line of credit.
B. Rent Increases
1. Retroactive rent increase
In May 1990 when the plaintiff agreed to become the only non-family shareholder of TA, Inc. there was nothing in writing from which he could discover any obligation of TA to pay a retroactive rent increase. Nor was he informed by any other shareholder, officer or director prior to becoming a shareholder that such was a possibility, although there was discussion concerning the cash-flow problems that led to a lower rent that may be adjusted at some time, that I infer to have meant prospectively. Moreover, prior to the point in time when the plaintiff became the only non-family shareholder of TA, the beneficiaries of TEKOA Realty Trust were the same four people as the shareholders of TA with the exception of Patrick Toomey, Sr., until his divestment in 1993. The lease did not obligate the lessee, TA, Inc., to pay a retroactive rent increase. There is no legitimate business purpose that has been shown in the evidence that served the interest of TA to have warranted this action. I can only infer that it was done to benefit the beneficiaries of the realty trust. This inference is supported by the fact that prior to the retroactive rent increase payment, TEKOA had made no distributions to its beneficiaries and that thereafter, it did. It was contrary to the duty of the controlling interest of the corporation, represented by a vote of the majority of the board of directors, to honor the interest of the plaintiff as minority stockholder.
Although the plaintiff was affected financially by this decision, the harm to him was indirect; the direct harm was to the corporation and this claim must be viewed as being derivative of the corporation’s right to obtain a reimbursement of funds improperly diverted. Given the fact that the only shareholder derivative action currently pending was filed in 1998, the retroactive rent increase payment falls outside the limitations period;[6] therefore, monetary relief cannot be ordered. Nor can it be ordered in the guise of an equitable order to the defendants to reimburse the corporation.
2. Prospective Rent Increase
Unlike the retroactive rent increase, there was a sufficient basis, in general, from which the plaintiff to have ascertained, in advance, that a rent increase was possible and likely, given an improvement in the business affairs of the corporation. Indeed, he did not oppose, in general, the concept of the corporation being obliged to pay a fair market rent. However, he did oppose and does challenge the right of the corporation and its controlling interest to pay rent for space that the lessor did not build or pay for, not to mention an increased rent.
Theoretically, a lessor in the position of TEKOA Realty Trust, upon improvements to real property being owned by it, does incur some additional liability, such as in increased real estate taxes and property insurance. This lease called for the lessee to pay the real estate taxes, however, as well as all other operating expenses. In addition, the lease placed the cost of any improvements and additions upon the lessee. Lastly, the lease implies, at the least, that improve *669 ments and additions made to the premises at the expense of the lessee are owned by the lessee until termination of the lease or cessation of occupancy, at which time ownership to any fixed improvements to the realty must be surrendered to the lessor.
The annual rent being paid prior to the rent increase totaled, in the year 1989, $19,417.56. After the addition and improvements were made, the area was increased from 3450 to 5724 square feet, an increase of 67%. The rent per square foot was increased prospectively from $5.63 per square foot to $7.00, a rate of increase similar to the increase in square footage. The increase granted to the lessor by the vote of the directors was to a total annual rent of $40,068.00. This amounts to a doubling of the dollar amount of rent being paid to TEKOA with little, if any, benefit flowing to the corporation, other than the increase in working space which it completely paid for and the tax deductibility of rent. Considering the prospective rent per square foot, when applied to the additional footage represented by the improvements and additions that had been paid for by TA, amounts to $15,918.00 in additional annual rent being paid to TEKOA, for which TEKOA had contributed nothing. In addition, the leasehold improvements were carried, and likely continue to be carried on the financial books of TA as an asset.
Like the retroactive rent increase and payment, this represents a derivative claim brought in the name of the corporation. The plaintiff does not oppose the amount of the increase in base rent per square foot, or the fact that the corporation should pay fair market rent for the original demised premises. The plaintiff opposes the need for the corporation to pay any rent on space that it built and carries on its books as an asset. Since the defendants have not shown that the lessor bears any additional liability for the increase in area, and that the corporation acts as the owner of the leasehold improvements, there is no business reason of which the court has been made aware for the corporation to agree to such an increase. One can only conclude, therefore, that the rent increase was granted, by the directors of the corporation, for the financial benefit of the beneficiaries of the realty trust and in derogation of their duty of loyalty to the corporation and the minority shareholder.
C. Bonuses
1. 1994 Bonus
In May 1994, while the other shareholders were awarded bonuses in the amount of $14,000.00 each, the plaintiff was allocated $7900.00. Moreover, from that amount, $6900.00 was withheld from the plaintiff on the grounds that since he was going to work for a competitor and that he may be filing a lawsuit that the majority considered baseless, they wanted to establish a fund of money arguably belonging to the plaintiff that they could access for reimbursement of their expenses and potential damage award.
This claim is clearly a direct claim for the benefit of the plaintiff. The defendants’ decision to withhold $6900.00 was in the nature of a non-judicial attachment. The defendants have offered no legal authority for the propriety of having done so, nor is the court cognizant of any statute or procedure which would allow such a self-help step. Once the decision was made to pay the plaintiff a bonus, and once bonuses were paid to the others receiving them, the plaintiff had an unfettered right to receive his. The decision to withhold the portion of his bonus in excess of $1000.00 was, therefore, unlawful.[7] However, as is discussed below, the decision to pay Meyer a lesser amount of money for the 1994 bonus than the others received is within the lawful discretion and business judgment of the majority, that the defendants have supported the decision in the evidence and without the plaintiff having proved otherwise.
2. Bonuses/Dividends from FY 1995 to the present
The plaintiff contends that since he is no longer an officer, director or employee, but remains a minority shareholder, he is entitled to a return on his investment through the annual payment of dividends at a rate that corresponds to his ownership interest, providing that the corporation performed profitably in a given year. The defendants say that the corporation has never paid dividends, that only those shareholders who are employees are paid bonuses from profit, that other shareholders who were not or are not employees do not and have not been paid bonuses or dividends, that employees who are not shareholders receive bonuses and that Mr. Meyer knew the situation prior to his acceptance of his shares. The defendants also point out that all employee-shareholders have always, with the exception of 1994, received the same dollar amount of bonus irrespective of their percentage ownership share, a situation that inured to the benefit of the plaintiff during the 1991 and 1992 fiscal years, since he received a bonus equal to the other shareholders notwithstanding his lesser interest.
Like the issues relative to the 1994 bonus, the plaintiff is entitled to bring this claim directly for his benefit. However, unlike the 1994 bonus situation, wherein there is no lawful right to withhold funds in the manner utilized by the defendants, the decision to pay a bonus instead of dividends is a reasonable exercise of the business judgment of the defendants to reward and encourage the efforts of employees. Moreover, a bonus is deductible to the corporation as part of employee remuneration and is taxable to the employee, while a dividend is taxable to both the corporation and the employee. It is reasonable to allow a close corporation under these circumstances to forego the payment of dividends in favor of bonuses and to expect the shareholders to recapture the investment made at the time of their purchase of a share of the long-term growth potential of the company and retained earnings at the time their shares are redeemed.[8] “The courts ought not to interfere . . . with the *670 sound fiscal management of the corporation by its directors, but declare as a general rule that the declaration of dividends rests within the sound discretion of the directors, refusing to interfere with their determination unless a plain abuse of discretion is made to appear.” See Donahue, supra, at 589, quoting Crocker v. Waltham Watch Co., 315 Mass. 397, 402 (1944). In Crocker, the articles of “association” mandated the payment of dividends. There are no similarities between Crocker and the case at bar and no support in the evidence herein to take this case outside the general rule. Given the consistent practice by the corporation of its bonus/dividend policy during the years in question, I find no abuse of discretion and no bad faith in their decision to pay bonuses to employees, including those who are shareholders, and to continue not to issue, or to refuse to declare and pay dividends.
D. Exculpatory Clause
The defendants seek protection under a clause in the Articles of Organization, in the nature of an exculpatory clause.
Article 6A of the TA Amended Articles of Organization [ex. 48] provides that:
The Corporation [TA] may enter into contracts or transact business with one or more of its directors, officers, or stockholders or with any corporation, organization or other concern in which any one or more of its directors, officers or stockholders are directors, officers, shareholders, or otherwise interested and other contracts or transactions in which any one or more of its directors, officers or stockholders is in anyway interested; and in the absence of fraud, no such contract or transaction, shall be invalidated or in any way affected by the fact that such directors, officers, or stockholders of the Corporation have or may have interests which are or might be adverse to the interest of the Corporation even though the vote or action of directors, officers or stockholders having such adverse interests may have been necessary to obligate the Corporation upon such contract or transaction ... In the absence of fraud, no director, officer or stockholder having such adverse interest shall be liable to the Corporation or to any stockholder or creditor thereof or to any other person for any loss incurred by it under or by reasons of such contract or transaction, nor shall any such director, officer or stockholder be accountable for any gains or profits realized thereon. [Emphasis supplied.]
This clause, however, appears to run afoul of G.L.c. 156B, §13, which states in relevant part:
(b) the articles of organization, in addition, may state:
(b)(l 1 /2) a provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director notwithstanding any such provision of law imposing such liability; provided, however, that such provision shall not eliminate or limit the liability of directors for (i) any breach of the director’s duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or violation of law, (iii) under section sixty-one or sixty-two, or (iv) for any transaction from which the director derived an improper personal benefit.
For that reason, then, given the facts found in this case, the exculpatory clause is either unenforceable or inapplicable.
III. Relief
A. 1994 Bonus
The plaintiff has proven entitlement to a judgment, in case no. 93-2545, that orders the defendants to pay the balance of the 1994 bonus withheld from him, in the amount of $6900.00, together with interest from May 31, 1994, the date of the payment of bonuses to the individual defendants by the corporation.
B. Prospective Rent Increase
This case does not present the typical “freeze-out” situation presented in other cases, wherein a minority shareholder, intending to recover an investment in a close corporation through salaried employment with the corporation, is forced out of employment and management by the majority. The plaintiffs first association with the defendants was as an employee/shareholder in an initial corporate creation, Toomey Engineered Systems Company, on a trial working arrangement, with a larger ownership interest and a guaranteed bonus. By all accounts, it was a successful venture and there was no reason to believe that it could not have continued to be so. It was he who sought a change in his situation by a merger with TA, Inc., together with employment by and a minority investment in that corporation. Thereafter, and although becoming disenchanted in the management of the corporation, he was not removed from his employment involuntarily; he was first willing to continue to remain employed with them and they with he. However, following the decisions made by the directors to make the excessive rent payments, both retroactive and prospective, he then decided to change his employment status, moving to another entity. Although I do not find that he was forced out of his employment with the intent to deprive him of the value of his investment, I do find that he left his employment because of the self-dealing on the part of the defendant directors/shareholders/TEKOA beneficiaries, who failed to honor their duty of utmost loyalty to his minority interest when they decided to divert funds of the corporation, in the form of excessive rent payments, for their own benefit and to his exclusion, and for no legitimate business purpose of the corporation, in breach of their duty of loyalty to the corporation.
“There is manifest unfairness to the excluded, non-consenting minority interests for the majority, year *671 after year, to appropriate to themselves substantially all of the net income of the enterprise, and such an operational policy, which deprives the company, and therefore its stockholders, of all opportunities for growth in net worth, serves no legitimate business purpose.” Crowley v. Communications for Hospitals, Inc., 30 Mass.App.Ct. 751, 758-59 (1991). In Crowley, a minority shareholder brought a derivative suit on behalf of the corporation and a direct suit on behalf of himself against the controlling shareholders. The Court found that the majority shareholders had paid themselves and their family members grossly excessive compensation while only marginal increments were produced for the minority shareholders during the same period. The Court ruled that relief for the minority shareholder should come in the form of a fund of money created for the benefit of all shareholders in the company and attorneys fees to the plaintiff. Similarly, in the case at bar, the defendant directors have improperly diverted $15,918.00 every year in excess rent payments to the lessor, beginning for fiscal year 1994. Given the May 1995 cutoff of claims due to the statute of limitations established by the successful grant of partial summary judgment, the rent payments that began for fiscal year 1996 to the present represent six and one-half years of annual payments, $15,918.00 in excess of fair rent, to the benefit of the four Toomey family shareholder/TEKOA beneficiaries.
“Equitable considerations are relevant in derivative stockholder actions . . . [and they] are most appropriate in dealing with relationships among stockholders in close corporations.” Martin v. F.S. Payne Co., 409 Mass. 753, 760 (1991). Here the majority have demonstrated that the funds they withdrew from the company were not required for working capital, debt service, or any other customary business need. Excess cash funds not required for the security of the enterprise or to conduct its business may be appropriate for distribution as a dividend." Crowle, supra at 766. Were the court to simply order the repayment to the corporation of these funds received by the four shareholder/beneficiaries,[9] the funds would then become available for repayment as bonuses to the three individual defendants who are shareholder/employees,[10] and such repayment would inure neither to the benefit of the corporation in the form of increased net worth of the corporation nor in the form of any payment to the plaintiff. Moreover, two of the beneficiaries of TEKOA are also directors[11] of TA; as directors, they are beneficiaries of an indemnification clause in the Articles of Organization,[12] wherein the corporation would, in effect, subsidize any payments ordered. Thus, the remedy of simple repayment to the corporation is not deemed sufficient to redress the wrong that has been done.
Since he is no longer employed by the corporation and, due to the “no-dividend” policy, the plaintiff cannot participate in company profit or growth until he redeems his shares. Notwithstanding the “no-dividend” policy of the company, the funds diverted by the directors for excess rent payments to TEKOA directly and, indirectly, to its beneficiaries (who also are, with the exception of the plaintiff, the rest of the TA shareholders) can be viewed as dividends. Therefore, equity demands an equalization payment to be made by the corporation to the plaintiff in an amount equal to the interest of a Toomey shareholder/TEKOA beneficiary, namely, 25% of the excess rent paid annually to TEKOA from fiscal year 1996 to the present. Given a fiscal year that commences in June of each year, the corporation has paid rent to TEKOA for the leasehold improvements, since June 1995, through the end of January 2002, the amount of $106,120.00. The plaintiff is therefore entitled to a judgment, in case no. 98-1097, that orders payment from Toomey Associates, Inc., and an order to the individual defendants to cause the corporation to make payment to the plaintiff, in the amount of $26,530.00, together with interest to be calculated as follows:
A. Upon the payment of $3979.50 from the date of May 31, 1996;
B. Upon the payment of $3979.50 from the date of May 31, 1997;
C. Upon the payment of $3979.50 from the date of May 31, 1998;
D. Upon the payment of $3979.50 from the date of May 31, 1999;
E. Upon the payment of $3979.50 from the date of May 31, 2000;
F. Upon the payment of $3979.50 from the date of May 31, 2001.
In addition, should the corporation continue to pay rent for the improvements paid for and owned by the corporation, the corporation shall also pay the plaintiff 25% of any such payment and for as long as such payments are made, for as long as the plaintiff continues to be a shareholder and for as long as the lessor has not acquired ownership of the leasehold improvements. However, should the directors of the corporation decide to forego payment of the rent for the leasehold improvements added and paid for by the corporation, the directors are enjoined from payment of such funds as would otherwise have been paid as rent and would otherwise be available for payment as either bonuses or in any other form that would inure to their direct benefit, but instead are ordered, for as long as the plaintiff continues to be a shareholder and for as long as the lessor has not acquired ownership of the leasehold improvements, to either pay said amounts to all shareholders as dividends or to retain said funds, on behalf of the corporation, to allow the net worth of the corporation to grow.
IV. Conclusion
Because the plaintiff has alleged and proved the essential elements of his derivative action and because the defendants have violated their duty of loyalty and *672 good faith, this Court orders that the plaintiff be compensated in a manner consistent with the above findings and rulings.
ORDER FOR JUDGMENT
For the foregoing reasons, it is hereby ORDERED that judgment enter in favor of the plaintiff as follows:
(1) in case no. 93-2545, that orders the defendants to pay the balance of the 1994 bonus withheld from him, in the amount of $6900.00, together with interest from May 31, 1994, the date of the payment of bonuses to the individual defendants by the corporation;
(2) in case no. 98-1097, that orders the defendants to cause Toomey Associates, Inc., to make payment to the plaintiff, in the amount of $26,530.00, together with interest to be calculated as follows:
A. Upon the payment of $3979.50 from the date of May 31, 1996:
B. Upon the payment of $3979.50 from the date of May 31, 1997;
C. Upon the payment of $3979.50 from the date of May 31,1998;
D. Upon the payment of $3979.50 from the date of May 31, 1999;
E. Upon the payment of $3979.50 from the date of May 31, 2000;
F. Upon the payment of $3979.50 from the date of May 31, 2001.
In addition, the judgment declares that, should the corporation continue to pay rent for the improvements paid for and owned by the corporation, the corporation shall also pay the plaintiff 25% of any such payment and for as long as such payments are made, for as long as the plaintiff continues to be a shareholder and for as long as the lessor has not acquired ownership of the leasehold improvements. However, should the directors of the corporation decide to forego payment of the rent for the leasehold improvements added and paid for by the corporation, the directors are enjoined from payment of such funds as would otherwise have been paid as rent and would otherwise be available for payment as either bonuses or in any other form that would inure to their direct benefit, but instead are ordered, for as long as the plaintiff continues to be a shareholder and for as long as the lessor has not acquired ownership of the leasehold improvements, to either pay said amounts to all shareholders as dividends or to retain said funds, on behalf of the corporation, to allow the net worth of the corporation to grow.

 At one time. Hatch was married to a Toomey family member, but they have since divorced.

 In a procedural history that the defendants have called “labyrinthian" (see exh. 94, p. 10), the 1993 complaint was the subject of a 1997 motion to amend, which added an allegation of a failure to pay bonus/dividend to his direct claims made in count I, by adding Count II in which the original claims are repeated arguably on behalf of the corporation as shareholder derivative claims, and by adding two defendants, TA, Inc. and Patrick C. Toomey, Jr. Although the amendment was allowed, the court denied additional time to the plaintiff to effect service on the new defendants, and consequently, they were never added to the 1993 complaint.
Thereafter, in June 1998, amotion for summary judgment was allowed, by agreement, as to Count II, with the court noting that “it must be brought by a shareholders derivative action,” and denied as to Count I, the court noting that personal wrongs against the plaintiff were being alleged. The court also consolidated the 1993 case with the newly-filed 1998 shareholder derivative action.
The 1998 action was the subject of a motion for partial summary judgment that was allowed without opposition in December 2000. This had the effect of imposing a date of May 13, 1995, as a statute of limitations cutoff of claims that are alleged to have arisen prior to said date; it also dismissed all direct claims of the plaintiff that alleged improper diversion of funds by TA, Inc., on the ground that such claims must be made in a shareholder derivative action. Thereafter, in February 2001, a stipulation was filed to the effect that the plaintiffs claims against Patrick Toomey, Sr., were dismissed with prejudice, and that the plaintiffs direct claims against the remaining individual defendants by reason of rent and other payments having been made to TEKOA and interest having been paid to Patrick and Eleanor Toomey were dismissed without prejudice.

 Although the decisions to construct the Addition and Improvements, and to make equipment purchases began in approximately December 1990, such decisions, by themselves, are not the subject of complaints by the plaintiff. They form the basis of his complaint that the corporation should not have decided, in May 1993, to pay increased rent for additional space for which the corporation paid in its entirety and for which the corporation has received nothing in return from the property owner, TEKOA Realty Trust.

 The defendants successfully obtained summary judgment on the issue of the limitation of claims under a three-year statute of limitations, becoming the law of the case.

 The defendants contend that the plaintiffs claim regarding the 1994 bonus is cut off by a 1995 limitations period. However, this claim, first raised in the 1997 amendment to the 1993 complaint, survives.

 Whether the plaintiff ought to be allowed to redeem his shares in a method different than that utilized by the corporation on the occasion of the redemption of the shares of Patrick Toomey, Sr., is not an issue before the Court at this time. Nor is the valuation of the corporation and, consequently, a share of stock in the corporation an issue before the Court. Unlike the plaintiff in Donahue, the plaintiff herein was given an opportunity to redeem his shares according to the same formula and valuation used for the redemption of the shares of Patrick Toomey, Sr., but Meyer declined, insisting upon a higher price.

 William Toomey, Jerome Toomey, Michael Hatch and Kane.

 William Toomey, Jerome Toomey and Michael Hatch.

 William Toomey and Kane.

 Amended Articles of Organization, Ex. 48, rider to Article 6, Clause 6B.